UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| WAYMON T. CRUSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:06 CV 014 |
| | ) | |
| HOOK-SUPERX, INC. | ) | |
| d/b/a CVS/PHARMACY, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Waymon T. Cruse was fired from his job as a CVS store manager purportedly because his employer determined he violated company policy by accepting tickets to minor league basketball games. But a reasonable jury could find that Cruse had received approval from his supervisor before entering into the agreement that gave him the tickets, did not even use the tickets himself, and that the CVS employee who actually did use the tickets more clearly violated CVS policy, but apparently was not disciplined. In addition, the CVS regional manager who investigated Cruse's conduct also accepted tickets to a sporting event but was not disciplined. Cruse, who is African-American, says that he was the victim of racial discrimination. CVS claims that its firing of Cruse had nothing to do with race, and has moved for summary judgment. Because there are several material issues of fact, a jury will need to sort this one out. CVS's motion for summary judgment is **DENIED IN PART**.

1

**BACKGROUND**

Cruse was hired as a management trainee by CVS in June 1996.  (DE 65 ¶1.)[1]  Until his termination in 2005, Cruse was Store Manager of a CVS store in Merrillville, Indiana.  (DE 23 ¶9.)  During his employment with CVS he received a copy of the CVS Employee Handbook.  (DE 65 ¶5.)  The Handbook contained the following:

> In certain cases, because of protocol or courtesy, it may be appropriate to accept an unsolicited gift or other personal benefit or favor of nominal value (e.g., inexpensive promotional items, such as mugs or hats).
>
> It may be appropriate for an employee to accept unsolicited reasonable forms of entertainment (such as lunches, dinners, or tickets to sporting events or concerts) in connection with business dealings; provided however, that the vendor attends the event with the employee.
>
> In the event an employee receives or solicits tickets or other entertainment benefits without vendor attendance, he or she shall be responsible for reimbursing the vendor for the full value of the benefit received.

(DE 65 ¶8.)  Plaintiff also received a copy of the CVS Code of Conduct.  (DE 65 ¶9.)   Section IV of the Code of Conduct, entitled "Conflict of Interest – Gifts & Entertainment," provides:

> Occasionally, gifts or entertainment may be offered to you to bias your judgment, and may be intended as a bribe or kickback.  CVS prohibits the acceptance of gifts for services rendered or business provided in the course of one's normal employment, except for unsolicited gifts of nominal value that are permitted under CVS's more specific policy on gifts set forth in Your Guide to CVS Corporation.  CVS policy also prohibits the offering of a gift or entertainment that can in any way be construed as wrongfully or unfairly attempting to influence a decision that will benefit either CVS or an employee of CVS.  In case of doubt, employees should seek guidance from the Legal Department.

(DE 66-11 at 3.)  In addition, CVS's Code of Conduct also states that the company does not

---

[1]  For clarity, the Court will refer to the docket entries, rather than the titles of the various documents contained in those entries, with paragraph or page citations when necessary.  Where the citation refers to attachments or exhibits for the entry, the specific document is denoted by a hyphenated suffix.  The suffix indicates the specific document within the general docket number (*i.e.,* "DE 66-__"), and is followed by the page or paragraph citation if required.

provide funding for sports promotion and team sponsorships.  (*Id*. at 11-12.)  An employee's failure to comply with the Code of Conduct may result in disciplinary action, including termination.  (DE 66-11 at 7.)  The policies outlined in these documents governed Cruse's employment with CVS.  (DE 67 at 3.)

Between July 2004 and his termination in 2005, Cruse reported to District Manager Jim Malone, who is not African-American.  (DE 65 ¶3.)[2]  Despite the fact that the Merrillville store received some heightened scrutiny in early 2004 because it had higher "shrink" – or losses – than the management desired, (*see* DE 66-15 at 6 & 8; *see also* DE 64 at 13), CVS was generally satisfied with Cruse's performance, (*see* DE 67 at 4).

In the summer of 2004, Michael Watkins, Director of Corporate Sales for the Gary Steelheads, a local minor league basketball team, approached Cruse offering a deal that included two season tickets and promotional announcements during games in exchange for certain CVS merchandise.  (DE 67 at 4-6.)  Cruse responded that he could not make the deal without approval from higher-ups in CVS.  (*Id*.)  Cruse sought guidance from Malone who told him to check with

---

[2] There is a discrepancy in the pleadings regarding the date on which Cruse was terminated.  Each iteration of the Complaint states that Cruse was terminated in January 2005.  (*See* DE 1 ¶9; DE 5 ¶9; DE 23 ¶9.)  Cruse's EEOC and Gary Human Relations Commission complaints, filed in May 2005, also state the termination occurred in January.  (*See* DE 23 ¶18; *see also* DE 23-2.)  CVS's answers admit Cruse was terminated in January.  (*See* DE 15 ¶9; DE 24 ¶9.)  It is also the date used in Cruse's interrogatory answers.  (*See* DE 67-3 at 9.)  But somewhere along the way the parties began to refer to June 2005 as the date of termination.  (*See, e.g.*, DE 65 ¶¶2-3 & 63; DE 67 at 3; DE 66-14 ¶9.)  Both dates are sometimes used within the same filing, and even within pages of each other in the same document.  (*Compare* DE 65 ¶63 (stating that the terminate occurred in June 2005) *with id*. at 10 (the title for Subsection H is "Cruse's Employment Terminated On January 26, 2005, Following CVS's Loss Prevention Investigation"); *also compare* DE 67 at 3 (using the June date) *with id*. at 8 (using the January date) *and* DE 67-3 at 9 (noting that Cruse was terminated five days after his January 20 meeting with Malone and Ribbke).)  Inasmuch as I am denying summary judgment, I assume that this confusion will be cleared up at trial.

3

the CVS's corporate office.  (*Id*.)  Cruse did, and reported to Malone that the corporate office informed him that if only a small amount of money was involved, he just needed approval from his district manager.  (*Id*.)  Malone approved the exchange as long as CVS was "getting some pay back from it."  (DE 65 ¶21.)  But Cruse did not give Malone any written information concerning the final agreement, nor did he disclose that CVS was to receive tickets under the agreement.  (DE 65 ¶22.)

On January 6, 2005, Cruse signed a written "Corporate Partnership Agreement" with the Steelheads.  The proposed barter was a modest one at best; the Steelheads were to receive CVS merchandise with an estimated value of $480 in exchange for two season tickets to the Steelheads' games, free parking passes, fourteen vouchers for Steelhead souvenirs and one PA announcement per game (the total package estimated to be worth $600).  (DE 67 at 6.)  Even though he received them, Cruse never personally used the Steelhead tickets.  (*See* DE 67-2 at 28-29; *see also* DE 67 at 6.)

Later that month, an employee in Cruse's store informed Malone that she had seen a copy of the agreement.  (DE 65 ¶30.)  Malone then contacted Roger Ribbke, a CVS Regional Loss Prevention Manager (who is not African-American), and Wayne Clark, a CVS Human Resources Business Partner.  (*Id*. ¶31.)  Ribbke – being responsible for, among other things, investigating policy and procedure violations – began an investigation.  (*Id*. ¶33.)  As part of the investigation, Ribbke interviewed Cruse.  (*Id*. ¶41.)  During the interview, Ribbke asked Cruse if he was carrying a gun because he observed a bulge in Cruse's ankle.  (DE 67-8 at 7.)  Cruse found this question offensive and asserts that it somehow demonstrates Ribbke's racial animus.  (DE 67 at 7.)  Ribbke ultimately concluded that the advertising portion of the Agreement would benefit CVS, but the tickets, parking and souvenirs could be construed to benefit Cruse.  (DE 65 ¶34.)

4

In his investigation, Ribbke also discovered allegations that Cruse had instructed them to "force balance" the store's "imprest fund" (petty cash) and that Cruse had failed to "markdown" the merchandise given to the Steelheads as well as other merchandise that had left the store, thereby inflating inventory.  (*See* DE 66-14 at 3; *see also* DE 65 ¶38.)  Cruse admits that these infractions, if true, would be violations of CVS policy.  (DE 66-5 at 7-8 & 10-12.)  He denies instructing his employees to force balance the imprest fund, (DE 64 at 9), but acknowledges he failed to markdown some merchandise, (DE 65 ¶¶29, 48).

Ribbke reported his conclusions to Clark and Anthony Caskey (a CVS regional manager).  (DE 65 ¶58.)  Malone advised Clark and Caskey that the results justified Cruse's termination, and the three decided that was the appropriate course.  (*Id*. ¶60.)  Sometime thereafter, Malone informed Cruse of CVS's decision.  (*See* DE 67 at 8; *see also* DE 67-3 at 9.)  CVS then replaced Cruse with a white employee.  (DE 65 ¶64.)  Significantly, there is evidence indicating CVS did not refer to the imprest fund or markdown issues when it informed Cruse of its decision to terminate his employment.  (*See* DE 67 at 14; *see also* DE 67-6 at 12-13; DE 67-8 at 10 & 14.)

Cruse argues that his termination was the result of racial discrimination.  He claims he was treated less favorably than other employees whose conduct was substantially similar.  (DE 67 at 11.)  First, he claims that Ribbke – the very person who conducted the investigation against him – was also subject to CVS's policies, yet he received tickets to the Indianapolis 500 Time Trials without negative consequences.  (*Id*. at 12.)  CVS acknowledges that Ribbke attended the Time Trials with other loss control managers as guests of vendors who were involved in a CVS Area Loss Prevention Meeting.  (DE 68 at 4.)  Second, Cruse notes that Yolanda Sanchez, an employee in Cruse's store who actually used the tickets from the Steelheads deal and was

5

"rewarded with a promotion." (*See* DE 67 at 13; *see also* DE 67-10 at 2.)

In addition, Cruse claims that throughout his employment with CVS, he was denied promotions due to his race. (DE 23 ¶11.) Cruse expressed interest in being promoted to Malone, Clark and White. (DE 66-7 at 6-7.) CVS gave Cruse a variety of reasons for not promoting him. (*Id*.) Malone stated that the "timing was not right." (*Id*.) Clark told Cruse that he should get into the Emerging Leader Program. (*Id*.) But Cruse admits that he was not denied any specific position because he never applied for any specific positions. (DE 66-2 at 17.)

In addition to Cruse's racial discrimination claims, Cruse also claims that CVS breached its employment agreement with him by denying him a bonus for 2004. (DE 23 ¶17.) According to CVS's policy, the 2004 bonuses were to be paid in March 2005, (*see* DE 66-14 at 14), and an employee is not eligible for the bonus if he has been terminated for violating company policy, (*see id*. at 13). In addition, CVS's employment materials – even those specifically discussing the bonus plan – expressly disclaim a contractual relationship. (*See* DE 66-8 at 5 (noting that "[n]either this guide nor any other communication by a management representative, whether oral or written, is intended in any way to create a contract of employment" and that "your status with CVS is that of an 'employee-at-will.'"); *see also* DE 66-14 at 19 (in the documents describing the bonus plan, noting "[t]his Plan does not create an express or implied contract of employment between CVS and a Participant. Both CVS and a Participant retain the right to terminate the employment relationship at any time and for any reason").) Yet Cruse contends that CVS breached Cruse's employment agreement by refusing to give him a bonus under the pretext that he had violated a company policy justifying his termination. (DE 67 at 14.) Since Cruse contests the validity of CVS's reasons for his termination, he claims CVS unlawfully denied him the 2004 bonus. (*Id*. at 23.)

**DISCUSSION**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In making this determination, a court construes "all facts and reasonable inferences from the record in the light most favorable to [ ] the non-moving party." *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005).

For the reasons given below, I find that there are genuine issues of material fact with respect to Cruse's discriminatory termination claim. There are no such issues, however, with respect to Cruse's failure to promote and breach of contract claims. So those claims fail.

**A.     Discriminatory Termination Claim**

The substantive examination of intentional race discrimination is the same under both Title VII and § 1981. *Patton v. Indianapolis Pub. Sch. Bd.,* 276 F.3d 334, 338 (7th Cir. 2002). Cruse proceeds principally under the familiar indirect method in which he must demonstrate that 1) he is a member of a protected class; 2) his job performance was satisfactory; 3) he experienced an adverse employment action; and 4) he was treated less favorably than one or more similarly situated employees outside of his protected class. *See Burks v. Wis. Dep't of Transp.,* 464 F.3d 744, 750-51 (7th Cir. 2006). If he establishes a *prima facie* case, the burden shifts to CVS to proffer a legitimate, nondiscriminatory reason for its action. *Id*. If CVS does so, the burden shifts back to Cruse to produce evidence showing CVS's proffered reason is a pretext for discrimination. *Id*.

7

Cruse is African-American, and thus a member of a protected class, and he experienced an adverse employment action when he was terminated. In addition, neither party disputes that prior to 2005, Cruse's performance was satisfactory. (DE-67 at 4.) Therefore, the only prong of the *prima facie* case in dispute is whether others who were similarly situated to Cruse, but not in the protected class, were treated more favorably.

Because the Seventh Circuit is "[c]oncerned with overly rigid treatment" of the similarly situated prong, it has "explained that 'similarly situated' means only that members of the comparison group are comparable to the plaintiff in all *material* respects." *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007) (quotation marks omitted, emphasis in original). In essence, "the inquiry asks only whether members of the comparison group are sufficiently comparable to the plaintiff to suggest that the plaintiff was singled out for worse treatment." *Id*. (quotation marks and brackets omitted). *See also Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (noting that the prong's "purpose is to determine whether there are enough common factors . . . to allow for a meaningful comparison in order to divine whether discrimination was at play"). The analysis of whether employees are similarly situated is a commonsense inquiry; and it may vary from case to case. *See Henry*, 507 F.3d at 564; *Barricks*, 481 F.3d at 560. At bottom, "[t]he inquiry is fact intensive, requiring consideration of the circumstances as a whole." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006).

Cruse points to two individuals who he says were similarly situated, but were not disciplined for conduct similar to the conduct that resulted in his termination. Cruse first notes that Ribbke, the loss prevention manager, received tickets to and attended the Indy 500 Time Trials. (*See* DE 67 at 12.) Cruse asserts that he and Ribbke were both subject to the same policies under the CVS Employee Handbook and the CVS Code of Conduct. It is important to

8

note, however, that Ribbke attended the time trials with the vender who supplied the tickets and the outing appears to have been approved by CVS in advance.  Second, Cruse also points to Yolanda Sanchez as a similarly situated employee who was treated more favorably than he.  (*See id*. at 13.)  Sanchez, a non-African American subordinate of Cruse in the Merrillville store, actually attended a Steelheads game with the tickets from the Steelheads deal.

Based upon the record before me, I find there is sufficient evidence for a jury to conclude Cruse was similarly situated to both Ribbke and Sanchez.  While it is true that the three did not report to the same supervisor and there is little evidence before the Court regarding their respective qualifications, reliance on those factors here makes no sense in the context of this case and would amount to the overly rigid application of the similarly situated prong the Seventh Circuit has discouraged.  Instead, the crucial similarities here appear to be that they were all subject to CVS policy regarding receipt of gratuities and conflicts of interest, yet CVS treated Cruse differently from Sanchez and Ribbke. .

First, on their face, CVS's policies apply to both Cruse and Sanchez.  (*See* DE 66-17; *see also* DE 66-11 at 3.)  While Cruse received the tickets, he never actually used them.  (*See* DE 67-2 at 18.)  This distinction is important because the policy articulated in the Employee Handbook is focused on the *use* of tickets without a vendor being present, rather than the mere *acceptance* of tickets.  (*See* DE 65 ¶8.)  As a result, there is a genuine issue as to whether Cruse even violated CVS policy by accepting the tickets.  Instead, he gave at least some of them to Sanchez, who actually used them to attend at least one of the games – a clear violation of the policy.  (*Id*.)  Thus, to the extent Cruse violated CVS policy at all, it appears they both did.  In that sense, they

9

are similarly situated.  Yet the policies were not applied uniformly.[3]  Thus, reference to Sanchez could allow a jury to infer a discriminatory intent in CVS's termination of Cruse.

Likewise, Ribbke's attendance at the Indy 500 Time Trials could also be seen as a violation of CVS's policies.  Because Ribbke attended the event with the vendor who supplied the tickets, (*see* DE 69-2 ¶6), his conduct does not violate the plain language of the CVS Employee Handbook policy on conflicts of interest, (*see* DE 65 ¶8; *see also* DE 68 at 4-5).  But it could be construed as a violation of the Gifts and Entertainment provision of CVS's Code of Conduct.  (*See* DE 66-11 at 3.)  To avoid that problem, Ribbke received prior approval to attend this event.  (*See* DE 69-2 ¶¶3-6.)  But according to Cruse, whose version I must accept at this stage of the proceedings, he also received approval.  (*See* DE 67 at 5-6.)  What's more, he ended up not even using the tickets.  If getting approval and attending a sporting event is fine with CVS (*i.e.*, what Ribbke did), it's difficult to fathom how accepting the tickets with approval but then not even using them at all is a problem.

Cruse and Ribbke are similarly situated *vis-a-vis* their obtaining of prior approval to avoid violating the Code of Conduct.  Yet there appears to be an inconsistent application of the policies.  CVS argues there is a material distinction between these two because Ribbke did not exchange CVS merchandise for his tickets, while Cruse allegedly did.  (*See* DE 68 at 4-5.)  Although the Code prohibits the acceptance of gifts or entertainment in exchange for goods, it also expressly discourages the receipt of gifts or entertainment that may bias an employee's

---

[3] Cruse and Sanchez are similar even though "identical rule violations" are "not dispositive of similarity."  *Perez v. Ill.*, 488 F.3d 773, 777 (7th Cir. 2007).  In *Perez* the various rule violations were "of significantly different severity," such that they did not present a valid comparison for the similarly situated analysis.  *Id*.  Here, there does not appear to be such obvious gradation with respect to the violations.

judgment.  (*See* DE 66-11 at 3.)  In that sense, both actions could be seen as violations of CVS's policy.  Moreover, while there may be other factual distinctions between these two occurrences – and indeed there may very well be valid justifications for CVS's different reactions – the question before me is whether there is no genuine issue of fact as to whether these two individuals are similarly situated, and I find that there is.

In this case the commonsense inquiry does not concern such factors as whether Cruse and Sanchez or Cruse and Ribbke had the same boss or performed the same duties.  They plainly did not.  Instead the commonsense inquiry is whether they were subject to the same rules or engaged in the same conduct.  They plainly were and they arguably did.  As a result, a jury could find that Cruse was, in all *material* respects, similarly situated to either Sanchez or Ribbke.

Because Cruse has provided sufficient evidence to demonstrate all four prongs of the *prima facie* case under *McDonnell-Douglas*, I must turn to the question of whether CVS proffered a legitimate nondiscriminatory reason for Cruse's termination.  CVS fired Cruse for entering an agreement without authority and accepting unauthorized gratuities, or at least that is what Cruse says he was told at the time of his termination.  CVS also claims it fired Cruse because of the allegations regarding the imprest fund and Cruse's failure to mark down products.  (*See* DE 64 at 7; *see also* DE 68 at 6-7.)  Cruse argues that because the other policy violations concerning the imprest fund and the markdowns were not mentioned until later, those other violations may be inferred to be pretextual.   (*See* DE 67 at 14.)

"The focus of a pretext inquiry is whether the employer's reason is honest, not whether it is accurate or wise." *Barricks*, 481 F.3d at 560 (quotation marks omitted).  But because there is evidence indicating CVS did not assert the other reasons when it fired Cruse, a jury could find that those newly-asserted reasons were not the true motivation for Cruse's termination.  This

11

alone is enough to create a genuine issue regarding pretext.  *See O'Neal v. City of New Albany*, 293 F.3d 998, 1005-06 (7th Cir. 2002).

>    B.    **Failure to Promote Claim**

Cruse alleges he repeatedly requested – and CVS repeatedly denied – promotion opportunities, but that CVS gave those opportunities to a similarly situated white employee. (*See* DE 23 ¶¶10-11.)  Like the termination claim, in order to establish a *prima facie* case of failure to promote on the basis of race, Cruse must demonstrate that he 1) is a member of a protected class; 2) applied for and was qualified for a position; 3) was passed over for that position; and 4) that a similarly situated employee not in the protected class was treated more favorably.  *Brill v. Lante Corp.*, 119 F.3d 1266, 1270 (7th Cir. 1997).  *See also Fischer v. Avanade, Inc.*, No. 07-1800, __ F.3d __, 2008 WL 681173, *7 (7th Cir. Mar. 14, 2008).

Although Cruse makes the allegations regarding CVS's refusal to promote him in his Second Amended Complaint, (*see* DE 23 ¶¶ 10-11), and CVS addresses that claim in its brief supporting its motion for summary judgment, (*see* DE 64 at 13-15), Cruse makes no argument regarding that claim in his response, (*see* DE 67).  When a party fails to address an argument in a summary judgment briefing, that is deemed a waiver.  *See Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008); *see also Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) (undeveloped arguments are waived).  Thus, the Court will not construct Cruse's argument for him.  *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) (noting that a district court is not required to "scour every inch of the record" for evidence that is potentially relevant to a summary judgment motion).

Setting aside the issue of waiver, the claim appears to be a nonstarter in any event because Cruse never applied for a specific position.  (DE 64 at 2.)  Cruse's deposition testimony

reveals that he only communicated a general interest in being promoted and he never submitted a specific application for any particular position.  (*See* DE 66-2 at 5-7; *see also* DE 66-2 at 21-DE 66-3 at 2.)  A mere interest in promotion is not enough to meet the second prong of a *prima facie* case of failure to promote.  *See Box v. A & P Tea Co.*, 772 F.2d 1372, 1377 (7th Cir. 1985), *cert. denied,* 478 U.S. 1010 (1986).

Additionally, Cruse has made no showing that a similarly situated employee was treated more favorably.  Although Cruse suggested that Armond, the manager of the Hammond CVS, was permitted to enter the Emerging Leader Program when he was not, he failed to show that the same person was responsible for making the discretionary decision for both Cruse and Armond or that the two were similarly qualified.  In fact, Armond was apparently removed from the program by Malone, whom Cruse blames for not recommending him.  (*See* DE 65 ¶78.)  Because Cruse has not supported his failure to promote claim in any subsequent pleadings, and the evidence before the Court fails to show a *prima facie* case, Cruse's failure to promote claim cannot succeed.

        **C.**        **Breach of Employment Agreement Claim**

Cruse claims that CVS breached its employment agreement with him when it refused to pay him a 2004 bonus.  Under the policies provided in the CVS Employee Handbook, which Cruse admits governed his employment with CVS, Cruse was an at will employee, and an employee who is terminated for policy violations is not entitled to bonus incentives.

Indiana law "recognize[s] two basic forms of employment-employment for a definite or ascertainable term and employment at will."  *Trinity Baptist Church v. Howard*, 869 N.E.2d 1225, 1229 (Ind. Ct. App. 2007).  *See also Meyers v. Meyers*, 861 N.E.2d 704, 706 (Ind. 2007). But an at will relationship may be "converted" into a relationship requiring good cause for

termination if the employee provides "adequate independent consideration." *Wior v. Anchor Indus., Inc.*, 669 N.E.2d 172, 175 (Ind. 1996). The situations in which such consideration have been found are relatively limited. *See id.* at 175-76.

On the record before me, there is no evidence that Cruse had an employment contract with CVS or that CVS was contractually obligated to give Cruse a bonus. In fact, CVS expressly disclaimed a contractual relationship in its employment documents and its literature discussing the bonus plan. (*See* DE 66-8 at 5; *see also* DE 66-14 at 19.) Nor is there any evidence that Cruse somehow provided sufficient additional consideration to convert his at will relationship into a contractual one. Therefore, under Indiana law, Cruse was an at will employee and had no contractual right to employment with CVS. Consequently, Cruse has no contractual claim to recover a bonus from CVS, and the Court will grant CVS summary judgment on that claim. This holding does not mean that the failure to pay a bonus is irrelevant to damages should Cruse prevail on his Title VII claim. But that is an issue that can be taken up at trial.

## CONCLUSION

For the foregoing reasons the Court finds that there are genuine issues of material fact which preclude summary judgment on Cruse's discriminatory termination claims. Those issues include, but are not limited to:

1. Whether CVS implemented its policies in an inconsistent way;

2. Whether Cruse received permission from CVS management to enter into the deal with the Steelheads;

3. Whether CVS's proffered reasons for Cruse's termination are pretextual; and,

4. Whether CVS terminated Cruse on the basis of his race.

Therefore, the Court hereby **ORDERS** as follows:

14

1. Defendant's Motion to Strike All Argument Contained in Plaintiff's Motion to Supplement and Reply in Support of Motion to Supplement [DE 76] is **DENIED**;

2. Defendant's Motion for Summary Judgment [DE 63] is **GRANTED IN PART** and **DENIED IN PART**.  Specifically, the Motion is **DENIED** with respect to Cruse's claims for discriminatory termination under Title VII and § 1981 and **GRANTED** with respect to Cruse's claims for discriminatory failure to promote and breach of contract; and

3. The prior pre-trial and trial dates in this matter were vacated by a March 10 order [DE 78].  Those dates will be reset in a subsequent notice.

**SO ORDERED**.

ENTERED: April 11, 2008

<div style="margin-left:50%">

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

</div>